UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

JOANNE SASSONE, MELANIE PARTELOW
NANNA, KRISTY NICKERSON, and
MARY BETH SANGALLI,                                    07 Civ. 4142 (KNK/MDF)

                                    Plaintiffs,

            -against-

VINCENT QUARTARARO, individually,
ROBERT J. REIDY, Jr., individually,
CAROL DEALLEAUME, individually, and
MAHOPAC CENTRAL SCHOOL DISTRICT,

                                    Defendants.
-----------------------------------------------------------x


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS 12(b)(6) MOTION TO DISMISS FIRST AMENDED COMPLAINT

## Preliminary Statement

        This memorandum of law is submitted by Plaintiffs in opposition to Defendants'

motion, made pre-discovery and pursuant to FRCP 12(b)(6), to dismiss the amended

complaint in this action.


## Standard of Review

        Pursuant to FRCP 12(b)(6) the Court is "not to weigh the evidence that might be

presented at a trial, but merely to determine whether the complaint itself is legally

sufficient". Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). In that connection

the Court "must accept as true all of the factual allegations set out in plaintiff's

complaint, draw inferences from those allegations in the light most favorable to plaintiff,

and construe the complaint liberally". Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).

Ultimately the court must deny a motion to dismiss for failure to state a claim

"unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief". Stewart v. Jackson & Nash, 976 F.2d 86, 87

(2d Cir. 1992).


The Presently Incontrovertible Facts
Set Forth in the Amended Complaint

*The Parties*

Plaintiffs Joanne Sassone, Melanie Partelow Nanna, Kristi Nickerson, and Mary

Beth Sangalli are citizens of the United States, domiciliaries of the State of New York,

and residents of the Northern Counties. Each Plaintiff is employed by the Mahopac

Central School District in the title of "Teacher's Aide" and, prior to their below-

referenced suspension from employment, each Plaintiff worked with autistic children in

the Mahopac Falls Elementary School's prestigious "Bridge Program" (First Amended

Complaint, para. 3).

Defendant VINCENT QUARTARARO (hereinafter "Quartararo"), who is sued in

his individual and personal capacities only, at all times relevant to this complaint was

employed as the Assistant Superintendent for the Defendant School District (*id.* at 4).

Defendant ROBERT J. REIDY, Jr. (hereinafter "Reidy"), who is sued in his

individual and personal capacities only, at all times relevant to this complaint was

employed as the Superintendent of Schools for the Defendant District (*id.* at 5).

Defendant CAROL DeALLEAUME (hereinafter "DeAlleaume"), who is sued in her individual and personal capacities only, at all times relevant to this complaint was employed as an Acting Interim Principal by the Defendant District. (id. at 6).

Defendant Mahopac Central School District is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State (*id.* at 7).

### *The Material Events*

In March of 2007 Plaintiffs non-disruptively expressed concerns to the Defendants regarding classroom conduct engaged in by Special Education Teacher Tammy Card (hereinafter "Card"), Speech Therapist Joyce Spiegel (hereinafter "Spiegel"), Teacher Aides Joe Levy (hereinafter "Levy"), Laurie Reynolds (hereinafter "Reynolds"), and Sherry Sreitas ( hereinafter "Sreitas"). *Id.* at 8.

In that connection the Plaintiffs truthfully related *inter alia* their personal observations of:

    a. Card, Levy and Reynolds' use in the classroom of degrading nicknames for the autistic children for whom they were responsible, including: "Sloth", "Poor Thing", "Drool Machine", "Nico Nico Pancake Freako", "Mosquito", "Old Man", "Froggy", "Satan's Child", "Chicken Butt", and *inter alia* "Rodent",

    b. Levy's slapping Card's buttocks and massaging her in front of their students,

    c. Spiegel and Levy giving each other massages in front of their students,

    d. Levy grabbing Sreitas' breasts in front of their students,

    e. Spiegel's exposing her breasts to their students while announcing that she wanted to "brighten your day",

    f. Spiegel attired in a crocheted blouse, without a bra, exposing her nipples to their students,

    g. Spiegel falsifying school records so as to give the false impression that she provided speech therapy to their students,

    h. Levy and Reynolds engaging in sex-related discussions in front of their students, and, *inter alia*,

    i. Levy and Reynolds' altering one of the autistic child's manually operated "communication device" [which that child was supposed to use to respond to questions by "speaking": "I am here" and/or "Hello everyone") so that when the child used the device it instead would state: "I'm sitting right here, can't you see me stupid" and "Hello, I am here today, everybody go away".

*Ibid.*

Following Plaintiffs' expression of these concerns, Defendants ordered them to reiterate their complaints to the Carmel Police - - as a result of which Spiegel, Card, Levy and Reynolds were, following the completion of a criminal investigation in the Spring of 2007, arrested and charged with various crimes (*Id.* at 9).

Out of concern that Plaintiffs would also communicate their observations to the parents of their autistic students and/or the media, Defendants agreed on April 6, 2007, to impose upon them a "gag" order of indefinite duration. In that connection Quartararo

acting on behalf of himself and his co-defendants on that date issued to each Plaintiff a
letter advising in pertinent respect:

> "You are hereby placed on administrative reassignment to home,
> effective April 10, 2007, with full pay and benefits, pending the
> District's investigation into certain issues which have recently
> come to our attention in connection with your employment.
>
> You are not allowed on school grounds or at school sponsored
> events until further notice. You are also not allowed to have any
> contact with students or their parents until further notice."

*Id.* at 10.

In fact Defendants' representation that there was a District investigation, either
underway and/or to be commenced, with respect to Plaintiffs' employment was:
i) false; ii) pretexual : iii) a calculated means of justifying what the Defendants later in
writing conceded (as to the "administrative reassignment") was in fact intended to be
punitive "disciplin[ary]" action; intended to  intimidate Plaintiffs and to chill them in the
exercise of their First Amendment right to publicly and non-disruptively express their
concerns about the systemic criminal wrong doing and the injuries/humiliation suffered
by the autistic children (*id.* at 11).

At no time did Plaintiffs' conduct and/or speech regarding the criminal wrong
doing in any way impair and/or potentially impair the effective and/or efficient operation
of the District - - a circumstance known to each of the Defendants (id. at 12).

At no time did Defendants or any of them have any factual basis to in good faith
believe that Plaintiffs':

a. Presence in the classroom, following their reports of criminal wrong doing, would in any way adversely affect the District and/or its delivery of educational services to any of its students;

b. Communications and/or opinions regarding the criminal wrong-doing would in any way interfere with either: a) the already completed criminal investigation; b) and/or the non-existent "investigation" falsely claimed to be forthcoming by the Defendants;

c. Communications and/or opinions regarding the criminal wrong doing would in any way influence and/or improperly influence the testimony of student victims and/or provide otherwise unavailable information to the District staff that had engaged in the criminal wrong doing; and/or,

d. Had themselves engaged in any wrong doing by not earlier reporting the crimes committed by their co-workers - - a circumstance confirmed by the Defendants' failure to take any remedial and/or investigative and/or punitive and/or disciplinary action against identically situated (to Plaintiffs) members of the District staff who had actual knowledge of the criminal wrong-doing and at no time reported it to Defendants or any of them (*ibid.*).

By reason of that gag order, the imposition of the forced administrative reassignment to home (*de facto* imposing upon them house arrest), and the threat - - albeit false - - that each of the Plaintiffs was under and/or going to be under investigation by the District and potentially subject to job termination, each of the Plaintiffs each was silenced and therefore: did not communicate with any of their autistic students regarding their concerns about the maltreatment to which they were subjected; did not communicate with

the parents/guardians of any of those students in order to apprise them of the despicable treatment accorded their children; and did not communicate with the media regarding the outrageous treatment accorded those students (*id.* at 13).

As a result of Defendants' First Amendment retaliation and their chilling of Plaintiffs' First Amendment protected rights to free speech, on May 29, 2007, Plaintiffs filed this action seeking compensatory and punitive damages (*id.* at 14).

In retaliation for Plaintiffs' expressions of concern regarding criminal wrong doing as engaged in by their co-workers and/or because of the filing of this action Defendants on or about June 19, 2007, agreed to take further punitive action against the Plaintiffs (*id.* at 15).

In that connection the Defendants acting through counsel notified Plaintiffs' union representative that Plaintiffs Nanna, Nickerson and Sangalli would not be permitted to work for the District during the summer - - work that each of those Plaintiffs had for years previously engaged in and by reason of which each earned several thousands of dollars in additional compensation (*id.* at 15).

On or about August 27, 2007, Defendants in writing directed each of the Plaintiffs to report two days thereafter to the District's elementary school library on the calculatedly deceitful premise that they were going to discuss their "employment" with the District (*id.* at 16).

On August 29, 2007, each of the Plaintiffs was subjected to a superficial interview several minutes in duration at which time they were separately asked a series of "yes" "no" questions regarding their original report as to criminal wrong-doing. The interviews elicited no new information, comprised a reiteration of data months earlier provided by

the Plaintiffs to the Defendants, and were conducted so as to after-the-fact create the false appearance that Plaintiffs were actually the subjects of investigation (*id.* at 17).

Subsequent to these perfunctory interviews each Plaintiff was informed by Defendants as to their work assignments for the 2007-2008 school year. In that connection and in furtherance of Defendants' retaliation against Plaintiffs, because of their reports of criminal wrong-doing and/or their filing of this action:

      a. None of the Plaintiffs was permitted to return to the prestigious Bridge Program,

      b. Each of the Plaintiffs was directed to assume degrading and grossly diminished job responsibilities than they previously had enjoyed in the Bridge Program, and,

      c. Each of the Plaintiffs was assigned to a new work location by reason of which Defendants intentionally stigmatized them and deliberately signaled to Plaintiffs' co-workers that they were being penalized for speaking out regarding the matters of public concern referenced *supra* (*id.* at 18).

As a proximate result of Defendants' intentional retaliatory conduct Plaintiffs have been: chilled in the exercise of their First Amendment protected rights; punished for their exercise of those rights; caused monetary losses; caused to suffer public humiliation; public embarrassment; anxiety; emotional upset; and otherwise have been rendered sick and sore (*id.* at 19).

*Plaintiffs' claims*

Under the premises Plaintiffs First Claim alleges that Defendants' conduct and retaliatory conduct violated their rights as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983 (*id.* at 21).

In addition, and since Plaintiffs' identically situated co-workers, who had actual knowledge of the at-issue criminal wrong-doing but did not report it, were not subjected to forced administrative reassignment, were not subjected to a gag order, were not threatened with an investigation concerning their employment, were not denied summer employment and *inter alia* were not subjected to job reassignments with diminution of job duties/responsibilities, Plaintiffs' Second Claim asserts that the disparate treatment to which Defendants intentionally subjected them violated their rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983 (*id.* at 23).

## POINT I

### PLAINTIFFS' FIRST AMENDMENT RETALIATION AND CHILLING CLAIMS ARE LEGALLY SUFFICIENT AND MUST BE TRIED TO A JURY

It is axiomatic that in order for a Plaintiff to state a legally sufficient First Amendment retaliation claim, he/she must allege: i) that the speech or conduct at issue is protected under the First Amendment; ii) that the Defendants took adverse action against him/her; and iii) that there was a causal connection between Plaintiff's protected

speech/conduct and the adverse action. <u>Washington v. County of Rockland</u>, 373 F.3d

310, 320 (2d Cir. 2004). In that connection at the pleading stage a causal relationship is

sufficiently set forth if the factual allegations "support the inference that the speech

played a substantial part in the adverse action". <u>Morey v. Somers Central School District</u>,

2007 WL 867203 (S.D.N.Y.)(CONNOR, J.).

In the case at bar Plaintiffs expressions of concern regarding the physical and

emotional endangerment of autistic school children by District staff members clearly

constitutes First Amendment protected speech. Additionally, Defendants' issuance of a

gag order of indefinite duration, banishment of each of the Plaintiffs to their homes,

prohibition against Plaintiffs communicating their concerns to the parents/guardians of

the abused autistic children and/or the media, denial of summer work assignments

resulting in pecuniary losses, and re-assignment of each to demeaning and less

prestigious assignments for the 2007-2008 school year clearly constitute adverse

employment action.

And as to the causal relationship, the amended complaint is unequivocal.

Expressly by reason of Plaintiffs' First Amendment protected speech, and shortly

following their having invoked their rights under the First Amendment, all of the adverse

employment actions were taken. In that connection Defendants in writing acknowledged

that they were motivated to take adverse action specifically because of Plaintiffs'

expressions of concern regarding these matters of health and safety.

Against this background Defendants' various arguments asserting that the

amended complaint is legally insufficient as to the First Amendment must be rejected.

For the Court's convenience they are treated *seriatim*.

Movants' assertion, presumably made in order to urge a rational basis for the un-ending gag order imposed upon the Plaintiffs, that Plaintiffs' report regarding the autistic child victims "is currently the subject of a criminal investigation" (Memorandum at 3), is false. The amended complaint makes it clear that "following the completion of a criminal investigation in the Spring of 2007" the Defendants' first imposed the gag order and banished Plaintiffs from the District's premises, ordering them confined to their homes (First Amendment Complaint, paras. 9-10).

As to movants' contention that it is "illogical" for Plaintiffs to urge that, "notwithstanding their original reporting of the wrongdoing to the Defendants and the Defendants' insistence that Plaintiffs relate the same to the police, Defendants violated their First Amendment right to discuss a subject which is a matter of public concern" (Memorandum at 5), we disagree. Manifestly the District and its officials had and continue to have an overriding objective of containing whatever damage had already occurred. Telling parents and/or guardians the truth could provoke law suits and/or complaints to the State Commissioner of Education. Dissemination of the truth to the media could provide a more widespread investigation of either: i) District staff members who abused their autistic pupils, and ii) District Administrators who chose not to investigate staff members who refused to report that abuse.

Defendants self-serving contention that "Plaintiffs' motive for speaking out. . .as portrayed in the original complaint, i.e., to protect their reputation" (Memorandum at 6) is disingenuous at best. While Plaintiffs did indeed allege that Defendants' imposition of the gag order and banishment of Plaintiffs from District premises was "intended by Defendants to give the false public impression that Plaintiffs had engaged in misconduct

11

and/or criminal wrongdoing of the same or a similar nature to Spiegel, Levy, Reynolds, Card and Freitas" (Complaint, para. 12), that circumstance comprised part of the damages suffered by Plaintiffs. The self-evident motivation for their speaking out in the first instance was their collective concern regarding the sexual and/or physically inappropriate conduct indulged in by their co-workers as it affected the autistic children in their custody.

Thus in the original complaint they alleged, by way of injuries that they had suffered: "public humiliation, public embarrassment, public accusations of unethical and immoral conduct, public shame, anxiety, emotional upset [and]. . .**deprivation of their right to express as citizens their opinions on matters of grave public concern**" (Complaint, para. 13, emphasis added).

Movants' reiteration of their hollow contention that Plaintiffs' motivation to speak out was with respect to "matters of purely personal interest" (Memorandum at 9), premised upon their distortion of the original pleading, hardly carries the day. The original complaint, as noted *supra*, alleged *inter alia* that the gag order and other adverse employment action resulted in the "deprivation of their right to express as citizens their opinions on matters of grave public concern" - - that is, the sexual and psychological abuse of autistic children by public school district employees.

Caselaw cited by movants supposedly to support their argument (Memorandum at 10), which itself is predicated upon a twisting and distortion of the original complaint's plain meaning, does not advance analysis.

Weintraub v. Board of Education of the City of New York, 423 F.Supp.2d 38 (E.D.N.Y. 2007), upon which movants misplace reliance, cuts against their argument.

Just as in <u>Weintraub</u> the Plaintiffs in the case at bar expressed complaints regarding gross improprieties in the classroom. The circumstance that the <u>Weintraub</u> communication were expressed "privately and through approved channels" makes absolutely no difference whatsoever as a matter of law. <u>Givhan v. Western Line Consolidated School District</u>, 439 U.S. 410, 414; <u>Garcetti v. Ceballos</u>, 126 S.Ct. 1951 (2006).

     <u>Puentes v. Board of Education of Union Free School District Nol. 21 of Town of Bethpage</u>, 24 N.Y.2d 996 (1969) as well supports Plaintiffs' claims in the instant action. There, as noted by movants, it was held that a Board of Education violated a teacher's First Amendment rights by suspending him without pay because he wrote letters to other teachers and district administrators critical of the District's failure to renew a probationary teacher. Here the Plaintiffs were immediately subjected to adverse employment action, including loss of pay, because they reported criminal wrongdoing in the classroom and sought to disclose the truth about it to the media and the abused children's families.

     <u>Vasbinder v. Ambach</u>, 926 F.2d 1333 (2d Cir. 1991) also supports Plaintiffs' claims here. For in that case a teacher's communication to the FBI regarding fraud, theft and misallocation of public funds was held to be First Amendment protected speech on a matter of public concern. Sexually abusing autistic infants in the public classroom is no less of concern to the public.

     And <u>Rookard v. New York City Health and Hospitals Corporation</u>, 710 F.2d 41 (2d Cir. 1983) also lends support to Plaintiffs' First Amendment claim. For in <u>Rookard</u> the speech found to be First Amendment protected concerned corruption and waste of

public moneys in a government run hospital. Abuse of autistic children in a public school setting is not less a matter of grave public concern.

To the extent Defendants suggest that Plaintiffs are "disguising their original allegations – involving their concern about their reputation" (Memorandum at 11), precious little need be said. Notwithstanding movants' warped and strained reading of that original filing, the complaint as first filed made it clear that the matters of public concern about which Plaintiffs expressed themselves and were later prohibited from expressing themselves pertained to the abuse of the autistic children.

Movants' argument (Memorandum at 11-12) that the first amended complaint does not "indicate how the desired speech would constitute an attempt to correct pervasive or systemic misconduct or illegal activity by the District", misses the point. As a threshold matter, Plaintiffs' initial in-house expression of concern regarding the abuse of autistic children was clearly First Amendment protected speech. The swift, causally related retaliatory actions taken by the District made out a legally sufficient First Amendment claim.

As to the desire of Plaintiffs, stifled by reason of the gag order, to communicate with the media and parents/guardians regarding the criminal wrongdoing indulged in by District staff with respect to their helpless victims, two points warrant brief mention. First, the gag order and related punitive actions chilled the Plaintiffs' prospective exercise of their First Amendment protected rights. Second, had Plaintiffs rights not be chilled their expression of concerns to the media and the families of the victimized children would have had the salutary effect of exposing to a broad-based community of concerned citizens the disgraceful treatment provided by the District to its autistic charges.

14

Obviously exposure of governmental wrongdoing to the proverbial "light of day" tends to prevent its recurrence and - - except in the case at bar - - compel the government's administrators to take investigatory and disciplinary action against staff members who refused to expose the wrongdoing at issue.

Waxing hypothetical and wobbling away from the controlling factual allegations contained in the amended complaint, Defendants pretend that there is a factual basis for asserting that "the protected speech was not the motivating factor in [Plaintiffs'] suspension and reassignment" and that the District "would have taken the same adverse action even absent the protected speech" (Memorandum at 12). Unfortunately on the face of the complaint, and given the immediacy of the retaliatory action following Plaintiffs first disclosure of wrongdoing, the only reasonable inference to be drawn is that the punitive actions were causally related to the protected speech.

In that connection Defendants ignore, but we will not, the circumstance that the District's claim of "investigation" was a pretext and its current claim that there is currently an ongoing criminal investigation is outright false. Both circumstances compelling suggest that the Defendants' motives were unlawful - - otherwise, why the dissembling and resort to pretext?

Defendants' speculation that the Defendants theoretically might lawfully have taken the adverse action referenced in the amended complaint because "Plaintiffs waited until the alleged commission of eight more of the purported acts after knowing of the first" is interesting. It is not, however, grounded in fact. Indeed it raises an issue as to motivation, at variance with the allegations of fact set forth in the pleading, which obviously cannot be resolved on paper without benefit of any discovery.

Movants' reliance upon Section 3020a of the New York State Education Law (Memorandum at 13-14), for the proposition that a paid suspension can be imposed in connection with formal disciplinary proceedings involving tenured staff, appears irrelevant. No formal charges were preferred. And the suspension, deprivation of wages over the summer months, the "gag" order, and the September 2007 degrading reassignments to which Plaintiffs were subjected speak not to misconduct by the Plaintiffs, but rather to free speech retaliation by the District.

Their argument that because Plaintiffs supposedly did not report the at-issue criminal wrongdoing "over a lengthy duration" [sic.], the District "would have certainly used its discretion in removing Plaintiffs from the location of this conduct and barring them from interacting with the parties involved" (Memorandum at 14), appears entirely misguided. First, whatever the District hypothetically might have done is not the issue in this case. Rather it is what the District actually did and what the motivation was for doing so. Second, since according to the amended complaint the District took no action whatsoever against District staff who knew about but never reported the acts of wrongdoing, it would more likely appear that the District's sole motivation in taking adverse action against Plaintiffs was to punish them for engaging in free speech and to prevent them from re-engaging in that speech publicly.

In any event, "removing Plaintiffs from the location of this conduct" has nothing to do with depriving them of work during the summer months - - and the concomitant moneys they would have earned.

Pretending that they somehow or other established, in connection with their pre-discovery 12(b)(6) motion, that the District can "avoid liability if it shows that plaintiff's

speech was likely to disrupt the government's activities to an extent that the employer's conduct outweighed the First Amendment value of the speech" (Memorandum at 15), Defendants self-servingly conclude that "the discipline and reassignment of Plaintiffs and its prohibitions of their desired speech" were justified (Memorandun at 16). We think not, and most certainly not on the skimpy record before the Court. As an initial matter, their bald conclusion is not supported by any facts.

Moreover, the speculative factual hypothesis is materially inconsistent with the factual averments in the amended complaint. For in paragraph "12" of that pleading it was plainly recited that:

"At no time did Plaintiffs' conduct and/or speech regarding the criminal wrong doing in any way impair and/or potentially impair the effective and/or efficient operation of the District - - a circumstance known to each of the Defendants. At no time did Defendants or any of them have any factual basis to in good faith believe that Plaintiffs':

a. Presence in the classroom, following their reports of criminal wrong doing, would in any way adversely affect the District and/or its delivery of educational services to any of its students;

b. Communications and/or opinions regarding the criminal wrong doing would in any way interfere with either: a) the already completed criminal investigation; b) and/or the non-existent "investigation" falsely claimed to be forthcoming by the Defendants;

c. Communications and/or opinions regarding the criminal wrong

doing would in any way influence and/or improperly influence the testimony of student victims and/or provide otherwise unavailable information to the District staff that had engaged in the criminal wrong doing; and/or,

d. Had themselves engaged in any wrong doing by not earlier reporting the crimes committed by their co-workers - - a circumstance confirmed by the Defendants' failure to take any remedial and/or investigative and/or punitive and/or disciplinary action against identically situated (to Plaintiffs) members of the District staff who had actual knowledge of the criminal wrong doing and at no time reported it to Defendants or any of them."

In short, apart from speculative and groundless hypothesis that is controverted by the amended complaint, there is simply nothing upon which movants base their argument.

## POINT II

### THE EQUAL PROTECTION CLAIM
### MUST BE TRIED TO A JURY

Upon the hypothetical assumption that "[i]f. . .Plaintiffs have failed to state a claim for violation of their First Amendment rights, , their [E]qual [P]rotection claim must fail as well" (Memorandum at 19), movants seek dismissal of the Second Claim in the amended complaint. Since the complaint manifestly does state a viable First Amendment claim, movants argument to the contrary is unworthy of further analysis.

To the extent that Defendants argue (Memorandum at 19) Plaintiffs fail to identify those employees who are alleged in the complaint to be identically situated to Plaintiffs - - that is who knew about the sexual and psychological abuse of the autistic students - - but unlike Plaintiffs reported nothing, we submit that the argument is premature at best. The Defendants know the identities of each staff member who worked in the Bridge Program with Plaintiffs. And they surely can recall who, unlike the Plaintiffs, reported nothing about the gross misconduct openly and daily engaged in inside the classrooms both in plain view and in their presence.

In any event if the burden of their Equal Protection claim is to turn on naming names, Plaintiffs are more than prepared to tell the Defendants that which they already know - - and for strategic and political reasons have chosen to ignore because of the implications of their sweeping cover-up.

To the extent that it is argued that the complaint fails to allege that the Defendants knew of other staff identically situated (Memorandum at 19), we suggest that that is irrelevant semantics. They know who reported what. They have known since last Spring who on the staff reported nothing. And they certainly have known who, amongst those who opted for silence rather than to protect children through the exercise their First Amendment rights, were obviously in the same classrooms, with the same autistic children who were victimized openly by co-workers.

And to the extent that movants declare, without factual basis, that the "District cannot be faulted for failing to take action against similarly situated employees of which [*sic.*] it was unaware" (Memorandum at 20), that presents an issue of fact that cannot be determined on a 12(b)(6) motion.

## POINT III

### SINCE PLAINTIFFS ARE DISCONTINUING THIS ACTION AGAINST THE INDIVIDUALLY NAMED DEFENDANTS, MOVANTS ARGUMENT THAT THE COMPLAINT MUST BE DISMISSED AS AGAINST THEM IS MOOT

In Point III of Defendants' Memorandum of Law it is argued that there is insufficient detail regarding the conduct of each of the individually named Defendants. On that premise it is urged that as to them, the complaint must be dismissed.

Rather than burden the Court with that issue at this time, pursuant to FRCP 41(a)1(b) Plaintiffs voluntarily dismiss, without prejudice, their claims against the individually named Defendants. Following discovery they will file a related case with all the details movants will ever need to know as to the individuals' conduct.

Given the dismissal without prejudice, the various arguments made by Defendants in Point III of their Memorandum are entirely moot.

### Conclusion

The motion to dismiss should, to the extent not moot, be denied in all respects.

Dated: White Plains, N.Y.
      December 19, 2007

LOVETT & GOULD, LLP
By: _____
Jonathan Lovett (4854)
Attorneys for Plaintiffs
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401